

Colin G. Prince
John B. McEntire, IV
321 West Eighth Avenue
Spokane, Washington 99204
253.593.5100
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| Estate of Spencer Wirth (through Jennifer Otieno-Owino, personal representative); and K.W., a minor (through Jennifer Otieno-Owino, guardian),<br><br>          Plaintiffs,<br><br>    v.<br><br>Spokane County; NaphCare, Inc.; MultiCare Deaconess Hospital; Mark Sprecher, individually; Matthew Farmer, individually;<br><br>          Defendants. | No.<br><br>Complaint for Damages<br><br>Jury Demanded |

TABLE OF CONTENTS

I.    Introduction ................................................................................. 1

II.   Parties ......................................................................................... 2

III.  Jurisdiction and Venue ................................................................ 4

IV.   Facts ........................................................................................... 4

      A.    Mr. Wirth collapses and his mother calls 9-1-1. ................. 4

      B.    MultiCare treats Mr. Wirth like a jailed drug addict. ......... 5

      C.    Spokane County deputies watch TV on their phones while ignoring Mr. Wirth as he died ................................................ 10

      D.    Defendants have a long history ignoring their duty to provide medical care ......................................................................... 15

V.    Claims ....................................................................................... 18

      A.    First Cause of Action: 42 U.S.C. § 1983 — Deliberate Indifference to Serious Medical Needs and Unsafe Conditions (Against Defendants Farmer and Sprecher) ......................... 18

      B.    Second Cause of Action: 42 U.S.C. § 1983 — Interference with Familial Association (Against Defendants Farmer and Sprecher) ...... 21

      C.    Third Cause of Action: 42 U.S.C. § 1983 — Municipal Liability for Unconstitutional Policies and Practices (Spokane County) ........ 22

      D.    Fourth Cause of Action: EMTALA — Failure to Provide Appropriate Medical Screening and Stabilizing (Against MultiCare Deaconess Hospital) ........................................................................... 25

      E.    Fifth Cause of Action: Medical Negligence (Against MultiCare Deaconess) ...................................................................... 27

      F.    Sixth Cause of Action: Corporate Negligence (Against MultiCare) ...... 29

      G.    Seventh Cause of Action: Negligence and Medical Negligence (Against Spokane County, NaphCare, Farmer, and Sprecher) ........... 30

      H.    Eighth Cause of Action: Washington Negligent Supervision (Against Spokane County and NaphCare) .................................... 32

      I.    Ninth Cause of Action: Wrongful Death and Survival (Against All Defendants) ..................................................................... 33

VI.   Jury Demand .............................................................................. 34

VII.  Relief Requested ........................................................................ 34

1

## I.    Introduction

2      On December 2, 2023, days after he was hit by a car, Spencer Wirth, a 27-year-

3   old father, collapsed at his mother's home. When she called 9-1-1 and requested an

4   ambulance, police responded and arrested Mr. Wirth on an outstanding warrant. The

5   jail, however, refused to accept Mr. Wirth because he was so clearly in need of medical

6   attention and sent him to the emergency room run by Defendant MultiCare Deaconess

7   Hospital. There, MultiCare's staff confronted a constellation of serious symptoms:

8   Mr. Wirth was tachycardic, with a heart rate of nearly 130 bpm, shortness of breath,

9   dizziness, and low blood pressure. His EKG was abnormal and showed dangerous

10  signs. His blood-test results revealed that a key marker of heart strain: a peptide called

11  "BNP" that should have been under 125 was nearly 12,000. On top of all that, Mr.

12  Wirth explicitly told Defendant's medical staff that his "lungs hurt."

13      These are classic signs of a pulmonary embolism. But rather than hospitalize

14  Mr. Wirth and attempt to diagnose or treat the problems, Defendant MultiCare's staff

15  listed Mr. Wirth's chief complaint as "medical clearance" and returned him to the jail.

16      No patient in Mr. Wirth's condition should have been discharged.

17      A day later, at 5:20 p.m., Mr. Wirth collapsed in his cell—a cell on 2-West, the

18  jail's medical unit. Minutes later, when deputies did their supposed medical checks,

19  nobody bothered to actually check on Mr. Wirth—no one spoke to him, let alone

20  actually checked to see if he was conscious or needed help. When Mr. Wirth briefly

21  regained consciousness and yelled for help, the deputies ignored him. When Mr. Wirth

22  pressed the medical alarm button in his cell, it made no sound because Defendant

23  Spokane County's staff had muted the alarm. When Mr. Wirth was slowly dying a few

24

Complaint                              – 1 –

feet away, the deputies continued watching TV on a phone and ignored the visible distress light.

One inmate, Robert Talley, watched this unfold. Although he didn't know Mr. Wirth, Talley was so disturbed that he wrote a letter to Defendant Spokane County's administrators detailing Mr. Wirth's death. The response: jail administrators investigated and saw nothing wrong.

Mr. Wirth was an inmate. But he was also a son, father, and human being who deserved to be treated as such. In this suit, his Estate and minor son, KW, seek justice on his behalf.

## II.  Parties

2.1     Spencer Wirth was a Washington resident and father of KW, his minor son. After his death, Mr. Wirth is represented through the personal representative of his estate, Jennifer Otieno-Owino, his mother, also a Washington resident.

2.2     KW remains a minor and is also represented by Jennifer Otieno-Owino, his grandmother and guardian.

2.3     Defendant Spokane County is a political subdivision of the State of Washington, that, through its Detention Services Department, operates the Spokane County Jail. As the entity responsible for the jail, Defendant Spokane County owed a non-delegable duty to care for those persons incarcerated there.

2.4     Mark Sprecher was, at the times relevant here, employed by Spokane County as a guard at the Spokane County jail and tasked with supervising the 2-West medical floor where Mr. Wirth was housed.

1    2.5    Matthew Farmer was, at the times relevant here, employed by Spokane

2    County as a guard at the Spokane County jail and tasked with supervising the 2-West

3    medical floor where Mr. Wirth was housed.

4    2.6    Defendant MultiCare is incorporated in Washington as a not-for-profit

5    corporation and health care organization with its principal place of business in Tacoma,

6    Washington. MultiCare operates throughout Washington, including MultiCare

7    Deaconess Hospital in Spokane, and is a Medicare-participating hospital with an

8    emergency department.

9    2.7    Defendant NaphCare, Inc., is a private, for-profit correctional healthcare

10    corporation, incorporated in Alabama, headquartered at 2090 Columbiana Road, Suite

11    4000, Birmingham, Alabama 35216. At all times discussed below, NaphCare regularly

12    conducted business in Washington through its employees, providing medical services in

13    multiple Washington correctional facilities. As part of its regular business, NaphCare

14    contracted with Spokane County to provide healthcare to people detained in the jail.

15    Through its contract and its conduct, NaphCare assumed responsibility for the hiring,

16    training, supervision, and discipline of medical staff, as well as adopting, implementing,

17    and enforcing medical policies, practices, and customs. NaphCare acted under color of

18    state law, was legally responsible to comply with constitutional requirements, including

19    to provide adequate medical are to incarcerated persons, making NaphCare a "person"

20    under 42 U.S.C. § 1983. NaphCare was responsible for providing constitutionally-

21    adequate medical care to Mr. Wirth. By employing licensed healthcare providers and

22    providing services, NaphCare qualified as a "health care provider" under Wash. Rev.

23    Code § 7.70.020(3).

24

Complaint                          – 3 –                    Connelly Law Offices
                                                            321 West Eighth Avenue
                                                            Spokane, Washington 99204
                                                            253.593.5100

## III. Jurisdiction and Venue

3.1    The Court holds federal-question jurisdiction because this Complaint includes federal claims under 42 U.S.C. § 1983.[1] Over the state-law claims, the Court holds supplemental jurisdiction because they arise out of the same case and controversy.[2]

3.2    The Court holds personal jurisdiction and venue because the torts occurred in Spokane, Washington.[3]

## IV. Facts

### A. Mr. Wirth collapses and his mother calls 9-1-1.

4.1    In late November 2023, Spencer Wirth, a 27-year-old father of one, was hit by a car as a pedestrian, leaving him bruised in the legs and with a contusion on his head. He was banged up but able to walk away from the accident. However, over the next four days, Mr. Wirth began feeling ill and deteriorated.

4.2    A few days later, Thursday, December 2nd, Mr. Wirth visited his mother, Jennifer Otieno-Owino, at home. While taking a shower, Mr. Wirth collapsed in her shower. Despite knowing her son likely had a warrant for his arrest, Ms. Otieno-Owino called 9-1-1 and asked for an ambulance.

4.3    According to later reports, when police responded, Ms. Otieno-Owino told officers her son had "been hit by a car" days before and was now "falling down and

---

[1] *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

[2] *See* 28 U.S.C. § 1367 (where court has original jurisdiction, "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy").

[3] *See* 28 U.S.C. § 1391(b)(2), (e)(1) (venue lies where "substantial part" of events occurred); *see also* Wash. Rev. Code § 4.28.185(1)(a) (personal jurisdiction exists where party commits "a tortious act within this state").

passing out." The officers woke Mr. Wirth, and he too explained he had been hit by a passing car in the dark a few days earlier on East 37th and South Mount Vernon, near Ferris High School on Spokane's South Hill. Consistent with being hit, Mr. Wirth had abrasions on his fingers visible to the officers. He also explained that he passed out anytime he walked more than a few steps. The officers then took Mr. Wirth not to the hospital but to the Spokane County jail.

4.4     There, unsurprisingly, an intake nurse found Mr. Wirth's blood pressure to be low—80/60—and noted Mr. Wirth was dizzy, pallid, and weak. With those concerning symptoms, she sent Mr. Wirth to the emergency department at MultiCare Deaconess.

**B.     MultiCare treats Mr. Wirth like a jailed drug addict.**

4.5     Although Mr. Wirth had been hit by a car, was passing out, could walk only with difficulty, and showed low blood pressure, when MultiCare received him, the emergency department assumed he was an overdosing addict who needed to be just healthy enough to jail. Mr. Wirth's "chief complaint," the MultiCare staff recorded, was "medical clearance":

**CHIEF COMPLAINT**:
Chief Complaint
Patient presents with
• Medical Clearance

4.6     Clearance for jail was not Mr. Wirth's chief complaint. Mr. Wirth was tachycardic—his resting heart rate was 132 beats-per-minute, beating as if he were out jogging rather than sitting on a hospital bed.

1

2

3

4



5    4.7    His blood pressure remained low(!). He was visibly short of breath. He

6 had multiple abrasions on his extremities. Importantly, he explicitly reported lung

7 problems to MultiCare staff: he "feels like his lungs hurt."

8    4.8    Testing revealed alarming signs. Mr. Wirth's EKG was abnormal with a

9 right ventricular conduction delay:

10

11

12

13

14

15

16    4.9    This is the type of EKG that should trigger an immediate intervention—

17 something is drastically wrong in Mr. Wirth's cardiovascular system.

18    4.10    Worse, Mr. Wirth's labs showed extreme heart distress. When the heart

19 cannot pump sufficient blood, it releases a protein called B-type natriuretic peptide,

20 more commonly referred to as "BNP." A normal BNP level is below 125.[4] Mr. Wirth's

21 BNP level that evening was astronomical: 11,944.

22

23

24

---

[4] This refers to pg/mL, the ratio of BNP per milliliter of blood.

4.11    A BNP level that high correlates to potentially disastrous cardiac collapse.

4.12    More problematically, MultiCare gave Mr. Wirth a chest x-ray, which showed *nothing*. Something invisible to the x-ray was causing Mr. Wirth's symptoms.

4.13    With those BNP levels and Mr. Wirth's other tests and symptoms, any differential diagnosis *must* include pulmonary embolism. Mr. Wirth was reporting shortness of breath, pain in his lungs, fainting, and his heart was strained, all classic pulmonary-embolism symptoms that arise in a simple internet search:[5]

---

[5] *See* Mayo Clinic, *Pulmonary Embolism* (Nov. 24, 2025). Mr. Wirth also displayed a rapid and irregular heartbeat, dizziness, and clammy skin—all "other symptoms that can occur with pulmonary embolism." *Id.*; *see also* Cleveland Clinic, *Pulmonary Embolism* (Nov. 24, 2025) (listing shortness of breath, unexplained chest pain, pale skin, rapid heartbeat as symptoms); Johns Hopkins Medicine, *Pulmonary Embolism* (Nov. 24, 2025) (listing sudden shortness of breath, chest pain, dizziness, irregular heartbeat, and hear palpitations as symptoms).

Connelly Law Offices
321 West Eighth Avenue
Spokane, Washington 99204
253.593.5100

## Symptoms

Pulmonary embolism symptoms can vary greatly, depending on how much of your lung is involved, the size of the clots, and whether you have underlying lung or heart disease.

Common symptoms include:

- **Shortness of breath**. This symptom usually appears suddenly. Trouble catching your breath happens even when resting and gets worse with physical activity.
- **Chest pain**. You may feel like you're having a heart attack. The pain is often sharp and felt when you breathe in deeply. The pain can stop you from being able to take a deep breath. You also may feel it when you cough, bend or lean over.
- **Fainting**. You may pass out if your heart rate or blood pressure drops suddenly. This is called syncope.

4.14    But MultiCare staff not only failed to test for a pulmonary embolism, they never even considered a pulmonary embolism—it wasn't on the differential diagnosis at all. Instead, Mr. Wirth's records reflect that MultiCare listed a smattering of possibilities, everything from dehydration to heart failure to infectious disease to organ failure:

GCS Total: 3
Differential diagnosis is broad, includes new heart failure, infectious process, dehydration, organ failure
IV established labs drawn fluids given and x-ray obtained

4.15    By failing to even consider a pulmonary embolism, MultiCare violated the standard of care.

4.16    Instead, MultiCare assumed Mr. Wirth was just one more drug addict from the jail and treated him accordingly.

1    4.17    Had MultiCare treated Mr. Wirth not as a jailed addict but as a patient

2    presenting classic signs of a pulmonary embolism, it would have given Mr. Wirth a d-

3    dimer test, a cheap and effective blood test that captures clot fragments. (A d-dimer test

4    costs less than $100—and that's at retail.)[6] Or given the extreme results of Mr. Wirth's

5    BNP and other symptoms, MultiCare should have skipped the d-dimer entirely and

6    given him a CT scan. It did neither.

7    4.18    Given Mr. Wirth's symptoms, MultiCare should have ordered a d-dimer

8    test.

9    4.19    Given Mr. Wirth's symptoms, MultiCare should have ordered a CT scan.

10    4.20    By failing to do either test, MultiCare breached the standard of care.

11    4.21    At that point, after 1 a.m. on December 3, 2023, Mr. Wirth was still dizzy

12    and tachycardic—his heart pumping 129 bpm:

13

14

15

16

17

18    **ED Care Timeline (continued)**

    01:33        **Vitals**        **Enc Vitals**
                                Pulse: **129** ‼
                                BP: 105/87
                                MAP (mmHg): 93 mmHg
                                BP Site: Left upper arm
                                BP Method: Automatic
                                **Orthostatic BP**
                                Pt Position for BP: Standing
                                BP Site: Left upper arm
                                **ED Vitals Alert**
                                Restart Vitals Timer: Yes

19

20    4.22    Rather than provide the necessary tests to diagnose his condition,

21    MultiCare told Mr. Wirth to sober up ("spoke to patient about getting help, sobering"),

22    and at 1:35 a.m., declared him healthy enough to jail and discharged him.

23

24

---

[6] *See* Ulta Lab Tests, *D-Dimer Test* (Nov. 25, 2025) (selling d-dimer test for $98.95).

Complaint                    – 9 –                    <span>Connelly Law Offices</span>
                                321 West Eighth Avenue
                                Spokane, Washington 99201
                                253.593.5100

4.23    Whether or not MultiCare knew what was wrong with Mr. Wirth, any patient in his condition should be admitted to the hospital. It was a breach of the standard of care to discharge him.

4.24    And in all the hours at MultiCare, Mr. Wirth was never seen by a doctor.

**C.    Spokane County deputies watch TV on their phones while ignoring Mr. Wirth as he died.**

4.25    Mr. Wirth arrived at the Spokane County Jail in the early hours of December 3, 2023, and was housed on 2-West.

4.26    That floor is designated for medically at-risk patients needing observation and care. To give an idea of the layout, 2-West contains 58 cells, including an upper level with a mezzanine, and cameras covering the main floor, the catwalk for the upper cells, and a 360-degree camera monitoring the whole. The cells have no beds, only stainless-steel toilets and sinks. Each has an emergency button.

4.27    Over the course of December 3–4, medical staff recorded a continuous tachycardic heartrate, hovering dangerously high between 114 and 126 bpm:

Connelly Law Offices
321 West Eighth Avenue
Spokane, Washington 99204
253.593.5100

| Type | Last Update Date Time | Blood Pressure Systolic | Blood Pressure Diastolic | Temperature | Pulse | Respirations |
|---|---|---|---|---|---|---|
| | Weight | BMI | | MAP | | |
| Vital Signs | 12/4/2023 8:15 AM PST | 107 | 73 | 97 | 126 | 17 |
| Vital Signs | 12/3/2023 4:41 PM PST | 122 | 77 | 96.8 | 117 | 16 |
| Vital Signs | 12/3/2023 8:54 AM PST | 131 | 89 | 98 | 114 | 16 |
| Vital Signs | 12/3/2023 7:53 AM PST | 124 | 86 | 97.8 | 120 | 18 |
| Vital Signs | 12/3/2023 2:38 AM | 121 | 85 | 98.2 | 125 | 16 |

4.28    Despite continued dangerously high tachycardia, NaphCare staff took no steps to address the condition. Mr. Wirth wasn't returned to the ER, he wasn't seen by a doctor, nor was he treated in any meaningful fashion.

4.29    Nor did NaphCare staff take any steps to contact cardiac heart failure services, specifically Pulse Heart Institute, despite instructions in Mr. Wirth's discharge paperwork to do so. In short, for a full day, Mr. Wirth continued to deteriorate, and none of NaphCare's medical staff did anything.

4.30    In the evening of December 4, 2023, deputies Mark Sprecher and Matthew Farmer were overseeing 2-West when, at 5:20 p.m., Mr. Wirth collapsed.

4.31    Thirteen minutes later, at approximately 5:33 p.m., Deputy Farmer began a round of medical checks. These were not real checks. Deputy Farmer never so much as opened the door, spoke to Mr. Wirth, or asked for a sign of life. He did not confirm

Complaint                              – 11 –

1  Mr. Wirth was conscious or alive. Records indicate Deputy Farmer walked the entire

2  floor of 58 cells in less than a minute.

3    4.32    Deputy Farmer's conduct is consistent Spokane County jail custom and

4  practice to perform medical checks for show. Records indicate numerous guards across

5  multiple shifts and multiple days performed cursory medical checks that failed to

6  actually confirm inmates were alive.

7    4.33    After Deputy Farmer's round, Mr. Wirth regained consciousness and

8  repeatedly yelled for help. He yelled loud enough that other inmates inside their cells

9  heard the cry—as did the deputies. Indeed, one inmate, Robert Talley, was so

10  infuriated by the deputies' failure to respond that he wrote a letter to the jail protesting

11  the treatment. In Mr. Talley's letter, he noted that Mr. Wirth yelled for help twice, and

12  the deputies "looked up," indicating they heard Mr. Wirth's plea:



18    4.34    The deputies deliberately ignored him.

19    4.35    At 5:45 p.m., Mr. Wirth regained consciousness and hit the panic alarm in

20  his cell. Except, it didn't alarm—no sound, no alert. It was muted.

21    4.36    To be clear, the alarm was operational—in full working order.

Complaint          – 12 –

1    4.37    At that moment, while Mr. Wirth was desperately calling for help,

2  deputies Farmer and Sprecher were watching TV on a phone. And they spent another

3  five minutes finishing their show while Mr. Wirth was slowly dying.

4    4.38    Mr. Talley witnessed the entire event: "they continue to look at phone

5  screen for 4 or 5 minutes," as he told jail administrators:



6

7

8

9

10    4.39    When the deputies finished their program, Deputy Sprecher stood up and

11  took an empty milk carton he'd been drinking from to the garbage can. It was only at

12  that point that he bothered looking into Mr. Wirth's cell.

13    4.40    When the deputy opened the door, he found Mr. Wirth unconscious and

14  covered in feces. He alerted nursing staff and an ambulance was called. When

15  paramedics arrived, Mr. Wirth had a pulse of 27 bpm and blood oxygen below 70%. The

16  paramedics were able to restore his pulse above 90 bpm and transported Mr. Wirth to

17  MultiCare Deaconess, arriving at 6:49 p.m.

18    4.41    On arrival, MultiCare again assumed Mr. Wirth was an addict who was

19  merely overdosing:

20

21

22

23

24

ED Care Timeline

Patient Care Timeline (12/4/2023 18:49 to 12/4/2023 22:19)

| 12/4/2023 | Event | Details |
|---|---|---|
| 18:49 | Patient arrived in ED | |
| 18:49:24 | Emergency encounter created | |
| 18:49:40 | Arrival Complaint | OVERDOSE |

Connelly Law Offices
321 West Eighth Avenue
Spokane, Washington 99204
253.593.5100

1    4.42    Approximately 10 minutes later, Mr. Wirth was pronounced dead.

2    4.43    An autopsy showed "extensive" blood clots in Mr. Wirth's lungs—

Lungs: Sections of both lungs show extensive occlusive thromboemboli composed of alternating cellular and acellular blood elements, with only very focal early peripheral organization. The adjacent interstitial tissues are hemorrhagic, and the pulmonary vasculature shows general congestion. There is patchy interstitial anthracotic pigment deposition.

—the reason he had complained to MultiCare that his lungs hurt.

4.44    And that was the cause of death: blood clots lodged in his lungs, precisely what his earlier symptoms and tests reflected:

AUTOPSY NO:    **231205-195**
DECEASED:        **WIRTH, SPENCER S.**
Page 3

**OPINION:**

Based on the autopsy findings and case history, as currently known, it is my opinion that Spencer S. Wirth, a 26-year-old White male, died as a result of pulmonary thromboembolism due to lower extremity deep vein thrombosis. The manner of death is natural. Venous thromboembolism is

4.45    Shortly after Mr. Wirth's death, Mr. Talley wrote his letter detailing what he saw. He called it the "most depressing" and "disturbing" event he'd ever seen and believed Mr. Wirth (whose name he did not know) would have had a chance if the deputies "did not wait to the end of what they were watching to go and check" on him:

4.46    Mr. Talley even offered to take a polygraph test.

4.47    A jail administrator responded to Mr. Talley's letter on behalf of Michael Sparber, the jail director and Spokane Senior Director of Law and Justice and final decisionmaker on the jail. The jail "investigated" the claims Mr. Talley raised and ratified the deputies' conduct: nothing suggested "that staff acted inappropriately or denied any services to you or other inmates on 2 West." When writing that response, the jail administrators possessed all the information above—logs showing pretense medical checks, muted medical alarms, and ignored yells for help, among other things showing unconstitutional conduct.

**D.    Defendants have a long history ignoring their duty to provide medical care.**

4.48    The Entity Defendants—Spokane County and NaphCare—employ policies favoring cash over care. According to NaphCare itself, the company has "many incentives to reduce costs," including its contracts and "its desire to satisfy the

Complaint                                    – 15 –                    Connelly Law Offices
                                                                        321 West Eighth Avenue
                                                                        Spokane, Washington 99204
                                                                        253.593.5100

1  customer," as well as "its intention to be chosen for future awards"—that is the

2  priority.[7]

3        4.49    NaphCare has financial incentives to deny medical care to inmates.

4        4.50    Given those incentives, it is unsurprising Defendants have become

5  notorious for their unconstitutional practices. Starting in 2017, eight inmates died in a

6  14-month stretch, prompting the Spokane County Human Rights Task Force to call for

7  an investigation into "an alarming trend of inmate deaths." One news report noted the

8  Spokane County Jail was among the worst nationally: the "number of deaths appears to

9  top most other jails in the country."[8]

10       4.51    The Entity Defendants routinely ignore inmates' medical needs and

11 perform inadequate medical checks. And when inmates suffer as a result, Defendants

12 intentionally cover it up. For example, in *Estate of Cindy Lou Hill v. NaphCare, Inc.*, No.

13 20-cv-410-MKD (E.D. Wash. 2020), Defendants failed to provide medical care to an

14 inmate dying of "a ruptured intestine," her "gastric contents" leaking "into her

15 abdomen."[9] According to Judge Dimke's order, the inmate, Ms. Hill, "laid screaming

16 in pain" so intense that her cellmate was forced to roll her onto "a blanket and drag her

17 to the cell door" so NaphCare's nurse could peer through the door slot to "assess"

18 her.[10] (Spokane County Jail is so chronically understaffed that the nurse could not even

19 enter the cell—no guard was available.)[11] When the nurse used "gentle palpitation,"

20

21 [7] *See* NaphCare, Inc., to Ms. Kimberly Rice, Office of Insp. Gen., *Response to the Draft Audit Report at 41, appx. 5 (Sept. 9, 2022)*.

22 [8] Chad Sokol, The Spokesman Review*, Human Rights Task Force Calls for Action After Eight People Die at Spokane County Jail, (Sept. 4, 2018)*.

23 [9] *Estate of Cindy Lou Hill v. NaphCare, Inc.*, No. 20-cv-410-MKD, ECF No. 88 at 6 (E.D. Wash. 2020) (Order Granting Pl.'s Motion for Default Judgment).

24 [10] *See id.* at ECF No. 88 at 3.

[11] *Id.* at ECF No. 88 at 3 ("Notified patient we could not enter the cell without an additional

Complaint                        – 16 –                        Connelly Law Offices
                                                               321 West Eighth Avenue
                                                               Spokane, Washington 99204
                                                               253.593.5100

Ms. Hill "screamed in pain."[12] She couldn't answer basic questions—"when it started," or "what it felt like."

4.52    One would think a hospital trip was in order. Not for Ms. Hill. Rather than an expensive emergency-room trip, Defendants saved cash by carting an obviously desperate inmate in a medical emergency down to 2-West (the second floor), locking her in a cell, and ordering "medical watch."[13]

4.53    Medical checks on Ms. Hill while she was dying on 2-West were either nonexistent or so cursory that they might as well be nonexistent. Guards and NaphCare staff failed to properly check on Ms. Hill as she deteriorated, and eight hours after being placed on medical watch—on the same floor where Mr. Wirth died—Ms. Hill's body was found.[14]

4.54    When Defendants realized the floor surveillance video would show deficient medical checks, they destroyed the footage. The video before Ms. Hill arrived was available. The video after Ms. Hill died was available. But "for the period between 9:15 a.m. and 4:00 p.m., which is when the documented 30-minute medical watch checks would have occurred," the video was erased, as Judge Dimke wrote.[15] Unsurprisingly, Judge Dimke found "Spokane County acted with the intent to deprive" Ms. Hill's estate of key evidence and entered judgment on liability as a sanction.[16]

4.55    Apart from cursory checks, medical watch at the Spokane County jail does not involve being watched by anyone medical. Instead, guards perform this duty.

---

officer," and none was available).

[12] *Id.* at ECF No. 88 at 3.

[13] *Id.* at 3–4.

[14] *See id.* at ECF No. 88 at 5–6 (noting Ms. Hill was on medical watch from 9:10 a.m. to 5:24 p.m.).

[15] ECF No. 88 at 9.

[16] ECF No. 88 at 31, 44.

Complaint                                     – 17 –                     Connelly Law Offices
                                                                        321 West Eighth Avenue
                                                                        Spokane, Washington 99204
                                                                        253.593.5100

Guards are tasked with reporting medical issues far outside their ability—gauging "unequal pupil size," "worsening chest pain," "change in speech," "weakness on one side of the body," and other medical issues guards have no business overseeing.

4.56    None of Defendants' jail guards are properly trained or qualified to assess those medical questions.

4.57    Ms. Hill's case isn't isolated—Defendants have repeatedly engaged in cursory medical checks and failed to remedy the problem. On September 10, 2023, a female inmate arrested on a federal probation violation died in the jail. In the aftermath, it was discovered guards tasked with cell checks were failing to gather "signs of life" or properly record cell checks. The jail was expressly told to improve medical cell checks—less than 90 days before Mr. Wirth died.

## V.    Claims

### A.    First Cause of Action: 42 U.S.C. § 1983 — Deliberate Indifference to Serious Medical Needs and Unsafe Conditions (Against Defendants Farmer and Sprecher)

5.1    Based on the facts above, Defendants Farmer and Sprecher violated Mr. Wirth's rights as a pretrial detainee under the Fourteenth Amendment. *See* 42 U.S.C. § 1983.

5.2    At all relevant times, Mr. Wirth was a pretrial detainee housed on 2-West, the Spokane County Jail medical floor designated for medically at-risk inmates in need of observation and care. Defendants Farmer and Sprecher were Spokane County jail deputies assigned to supervise 2-West and to perform medical checks, respond to medical duress alarms, and reasonably ensure the safety of medically fragile detainees like Mr. Wirth. In doing so, they acted under color of state law.

5.3     Mr. Wirth's condition on 2-West presented an obvious, serious medical need. Mr. Wirth had just been discharged from MultiCare's emergency department after presenting with symptoms that included shortness of breath, lung pain, dizziness, low blood pressure, an abnormal EKG, ongoing tachycardia, and he required treatment. Mr. Wirth was at substantial risk.

5.4     Defendants Sprecher and Farmer knew or should have known about Mr. Wirth's risk. Defendants knew or should have known that 2-West housed medically compromised inmates and that a collapsed, convulsing detainee on the medical floor was at substantial risk of serious harm, including cardiac or respiratory arrest from an undiagnosed pulmonary embolism. Indeed, Mr. Wirth's placement alone is sufficient for actual notice, and a reasonable guard would have understood Mr. Wirth was at substantial risk.

5.5     Despite this knowledge, Defendants Farmer and Sprecher deliberately ignored Mr. Wirth's medical crisis—their response was objectively unreasonable. When Defendant Farmer performed a "round of medical checks" around 5:33 p.m., he did not open Mr. Wirth's door, speak to him, or confirm that he was conscious, breathing, or otherwise alive. He walked the entire 2-West floor in less than a minute, conducting only cursory checks that did not actually verify signs of life from Mr. Wirth.

5.6     Defendants ignored Mr. Wirth's audible cries for help. After the cursory round of supposed cell checks, Mr. Wirth regained consciousness and repeatedly yelled for help loudly enough that other inmates and the deputies heard him. Defendants deliberately ignored him—despite Mr. Talley's observation that the deputies "looked up," confirming they heard the cries.

Connelly Law Offices
321 West Eighth Avenue
Spokane, Washington 99204
253.593.5100

5.7    Defendants ignored the medical alarm. At approximately 5:45 p.m., Mr. Wirth regained consciousness again and triggered the emergency medical alarm in his cell. The alarm hardware was functional but had been muted. That alarm also contained a visible light, which they chose to ignore in favor of watching TV on a phone and eating. They ignored Mr. Wirth as his heart rate and blood oxygen levels dropped to catastrophic levels.

5.8    Defendants intentionally chose to perform sham checks, ignored audible cries for help, employed a muted emergency alarm, ignored the visible emergency light, and continued watching television instead of promptly investigating a medical emergency on a designated medical floor. Those decisions were objectively unreasonable in light of the facts known to them and the high degree of risk they posed. Reasonable officers in their position would have recognized that a collapse, convulsions, repeated cries for help, and activation of an emergency duress button by a medically fragile detainee on 2-West presented a substantial risk of serious, life-threatening harm, and would have taken readily available measures such as promptly entering the cell, summoning medical staff, and initiating emergency response.

5.9    Defendants' actions and omissions were a direct and proximate cause of Mr. Wirth's prolonged suffering, cardiopulmonary collapse, and death. Had they conducted meaningful checks, responded to his cries, and promptly investigated his alarm and condition, Mr. Wirth would have been evaluated and treated before his pulmonary emboli progressed to fatal circulatory and respiratory failure.

5.10    Their failure to take reasonable available measures to abate the risks, despite the obviousness of Mr. Wirth's condition, was objectively unreasonable.

Connelly Law Offices
321 West Eighth Avenue
Spokane, Washington 99204
253.593.5100

1       5.11    As a result of these constitutional violations, Mr. Wirth suffered conscious

2   pain and suffering, fear, and loss of chance of survival prior to death, and his Estate and

3   statutory beneficiaries, including his minor child KW, have suffered wrongful-death

4   damages, loss of companionship and support, and other harms. Plaintiffs seek

5   compensatory damages in an amount to be proven at trial, as well as punitive damages

6   against Defendants Farmer and Sprecher for their reckless and callous indifference to

7   Mr. Wirth's constitutional rights, together with reasonable attorneys' fees and costs

8   under 42 U.S.C. § 1988, and any other relief the Court deems just and proper.

### B.    Second Cause of Action: 42 U.S.C. § 1983 — Interference with Familial Association (Against Defendants Farmer and Sprecher)

    5.12    Based on the facts alleged above, Plaintiffs reallege and incorporate all

prior allegations as though fully set forth here and allege that Defendants unlawfully

interfered with the liberty interest of Mr. Wirth's minor child, KW, in the continued

support, companionship, and society of Mr. Wirth, in violation of KW's substantive

due-process rights under the Fourteenth Amendment and 42 U.S.C. § 1983.

    5.13    Mr. Wirth was a 27-year-old father to minor child KW. They had an

established, close familial relationship characterized by mutual love, affection, and

support—indeed, Mr. Wirth was KW's primary parent and had custody of KW at the

time of his death.

    5.14    As a direct consequence of Defendants' deliberate indifference and

systemic policies described above, Mr. Wirth died from untreated pulmonary emboli

while in custody, permanently depriving his child of his companionship, guidance, and

emotional support.

Connelly Law Offices
321 West Eighth Avenue
Spokane, Washington 99204
253.593.5100

1    5.15    Defendants Farmer and Sprecher, acting under color of state law,

2    knowingly ignored a life-threatening medical crisis on 2-West by conducting sham

3    checks, disregarding Mr. Wirth's collapse and convulsions, ignoring his repeated cries

4    for help, and failing to respond promptly to his emergency button while they watched

5    television.

6    5.16    This conduct was so egregious and indifferent to human life as to shock

7    the conscience. It was not a mere error in medical judgment; Defendants placed their

8    personal entertainment above the most basic obligation to safeguard a detainee's life.

9    Defendants knew or were deliberately indifferent to the fact that their actions created a

10   substantial risk that Mr. Wirth would suffer fatal harm and that KW would be

11   permanently deprived of a parent.

12   5.17    As a direct and proximate result of Defendants' conduct, Mr. Wirth's

13   familial relationship was irreparably severed, causing KW to suffer loss of

14   companionship, emotional distress, grief, and other damages. Plaintiff KW seeks

15   compensatory damages for violation of his substantive due-process rights, as well as

16   punitive damages against the individual defendants who acted with reckless and callous

17   indifference, and attorneys' fees and costs under 42 U.S.C. § 1988, in amounts to be

18   proven at trial.

19   **C.    Third Cause of Action: 42 U.S.C. § 1983 — Municipal Liability for Unconstitutional Policies and Practices (Spokane County)**

20

21   5.18    Based on the facts above, Spokane County is liable under 42 U.S.C. § 1983

22   for policies, customs, and practices that caused the denial of constitutionally adequate

23   medical care and safe conditions of confinement to Mr. Wirth as a pretrial detainee.

24

1       5.19   Defendant Spokane County operates and is responsible for the Spokane

2   County Jail. Spokane County has long employed policies, customs, and practices that

3   prioritize cost savings and institutional convenience over the medical needs and safety

4   of detainees. These include the use of non-medical "medical watch" by untrained

5   guards, cursory "for show" cell checks that fail to confirm signs of life (let alone well

6   being), tolerance of muted or ineffective medical duress alarms, and systemic failures to

7   ensure that medically fragile detainees are evaluated and treated by qualified medical

8   professionals.

9       5.20   The pattern of inmate deaths and serious medical neglect at Spokane

10  County Jail, particularly on 2-West, demonstrates the existence of these policies and

11  customs. As outlined above, Spokane County staff have repeatedly failed to perform

12  proper cell checks on medically at-risk inmates, causing or contributing to the deaths of

13  multiple people. And given the prior deaths and investigations, Defendant Spokane

14  County was on notice of specific deficiencies in cell checks and medical watch—

15  including notice arriving shortly before Mr. Wirth's death. After the inmate death in

16  September 2023, the jail was expressly told to improve its practices, including ensuring

17  that guards verified that inmates were alive during checks. Nevertheless, Spokane

18  County deliberately chose not to correct these practices and continued to rely on

19  cursory checks on 2-West.

20      5.21   The events surrounding Mr. Wirth's death further demonstrate Spokane

21  County's customs and deliberate indifference. Deputies on 2-West, including

22  Defendant Farmer, routinely walked the floor in less than a minute, glancing into cells

23  without opening doors, speaking to inmates, or confirming consciousness, breathing, or

24

1    any other sign of life. Mr. Wirth's emergency button was in working order but muted so

2    that its activation produced no audible alarm, and jail staff accepted and continued this

3    dangerous configuration. The deputies ignored Mr. Wirth's repeated cries for help and

4    finished watching a program on a phone before checking his cell.

5        5.22    Defendant Spokane County has also ratified and adopted these

6    unconstitutional practices. When Spokane County received Mr. Talley's letter, a jail

7    administrator responded on behalf of senior jail leadership and final decisionmakers,

8    asserting that staff acted appropriately, thereby ratifying the deputies' conduct despite

9    having access to logs, video, and other evidence of deficient checks and muted alarms.

10        5.23    Defendant Spokane County has maintained longstanding policies and

11    customs of: (a) assigning non-medical guards to perform "medical watch" and complex

12    medical assessments beyond their training; (b) tolerating and effectively endorsing

13    cursory checks that do not verify signs of life; (c) allowing or instructing staff to mute or

14    disregard medical duress alarms; (d) failing to remedy dangerous practices even after

15    multiple deaths and judicial findings of evidence destruction; and (e) ratifying

16    substandard care and response on 2-West.

17        5.24    These policies and customs were the moving force behind the

18    constitutional violations suffered by Mr. Wirth. Because of Spokane County's systemic

19    practices, Mr. Wirth was placed on a medical floor where his vital signs were monitored

20    but no meaningful care was provided, where untrained guards were responsible for

21    recognizing serious medical deterioration, where medical duress alarms did not sound,

22    and where staff performed perfunctory rounds that did not confirm that medically

23    fragile detainees were even alive.

24

5.25     As a direct and proximate result of Spokane County's policies, customs, and ratification, Mr. Wirth's serious medical needs went unaddressed, his collapse and convulsions were ignored, his emergency alarm was not meaningfully acted upon, and life-saving intervention was delayed until his circulation and oxygenation had catastrophically failed. He suffered pain, fear, and loss of life, and his Estate and statutory beneficiaries have sustained economic and non-economic damages.

5.26     Plaintiffs seek compensatory damages against Spokane County in an amount to be proven at trial, together with attorneys' fees and costs under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper. Plaintiffs do not seek punitive damages against Spokane County.

**D.     Fourth Cause of Action: EMTALA — Failure to Provide Appropriate Medical Screening and Stabilizing (Against MultiCare Deaconess Hospital)**

5.27     Based on the facts above, Defendant MultiCare violated the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd, commonly called "EMTALA."

5.28     Despite alarming symptoms and test results, MultiCare treated Mr. Wirth as a "jail clearance" case rather than a critically ill patient. When MultiCare received him, Mr. Wirth presented with a constellation of symptoms that included shortness of breath, lung pain, dizziness and fainting (also called "syncope"), tachycardia with resting heart rates in the 120s, abnormal EKG with right ventricular conduction delay, and an extremely elevated B-type natriuretic peptide (BNP) level of approximately 11,944, which signaled dangerous cardiac strain. A chest x-ray showed no obvious pulmonary congestion, indicating that something not visible on plain films was causing his severe symptoms.

Complaint                                        – 25 –                        CONNELLY LAW OFFICES
                                                                                          321 West Eighth Avenue
                                                                                          Spokane, Washington 99204
                                                                                          253.593.5100

5.29    Any non-jail-related patient would have been hospitalized, tested, and treated. And any non-jail-related patient in Mr. Wirth's circumstances would have been cared for directly by a medical doctor. But rather than hospitalize Mr. Wirth and perform additional testing, Defendant MultiCare simply declared him well enough to jail.

5.30    By labeling him as "medical clearance," failing to consider pulmonary embolism, and withholding basic diagnostic tests that MultiCare would have provided to similarly situated, non-incarcerated patients with the same signs and symptoms, MultiCare failed to provide an appropriate medical screening examination as required by 42 U.S.C. § 1395dd(a). The screening he received was neither reasonably calculated to identify whether he had an emergency medical condition, nor comparable to the screening MultiCare ordinarily offers to other patients with similar presentations. Indeed, Mr. Wirth's medical records show MultiCare understood his symptoms were serious, they had no real idea of what was causing his symptoms (infectious disease, heart failure, organ failure, dehydration, etc.), knew his symptoms had not improved, and yet discharged him anyway.

5.31    MultiCare also failed to provide stabilizing treatment as required by 42 U.S.C. § 1395dd(b). When Mr. Wirth arrived at MultiCare, it was clear he presented with an emergency medical condition—a fact MultiCare either actually knew or should have known based on Mr. Wirth's vitals, lab values, and clinical presentation. Rather than admit him for monitoring and treatment or perform diagnostic testing to stabilize his condition, MultiCare discharged him back to the jail in the early morning hours of

December 3, 2023, while he remained persistently tachycardic, dizzy, and medically unstable.

5.32    As a direct and proximate result of MultiCare's failure to provide an appropriate screening examination and stabilizing treatment, Mr. Wirth's pulmonary emboli went undiagnosed and untreated. He returned to the jail in a continuing state of medical emergency, where his condition deteriorated over the next day, leading to his death.

5.33    Plaintiffs seek all remedies available under 42 U.S.C. § 1395dd, including compensatory damages for personal injury and wrongful death in an amount to be proven at trial, together with attorneys' fees and costs where available, and such other relief as the Court deems just and proper.

## E.    Fifth Cause of Action: Medical Negligence (Against MultiCare Deaconess)

5.34    Based on the facts above, Defendant MultiCare and its staff involved in Mr. Wirth's care committed medical negligence. *See* Wash. Rev. Code § 7.70.

5.35    MultiCare and its involved providers were "health care providers" within the meaning of RCW 7.70.020 and owed Mr. Wirth a duty to exercise that degree of skill, care, and learning possessed by reasonably prudent health-care providers in the same profession in the State of Washington acting in the same or similar circumstances.

5.36    When Mr. Wirth presented to the MultiCare emergency department from the jail, he reported recent trauma from being hit by a car, episodes of collapse, shortness of breath, and lung pain. He was visibly pallid, weak, and unable to walk more than a few steps without passing out. His vital signs and tests revealed severe tachycardia, low blood pressure, an abnormal EKG showing right ventricular

Complaint                          – 27 –                    <span>Connelly Law Offices</span>
                                                             321 West Eighth Avenue
                                                             Spokane, Washington 99204
                                                             253.593.5100

conduction delay, an extraordinarily high BNP level around 11,944, and complaining that his "lungs hurt." His chest x-ray revealed no obvious pulmonary congestion or infiltrate, indicating that structural heart failure or pneumonia did not likely explain his symptoms.

5.37    Under these circumstances, any reasonably prudent emergency-medicine providers would have included pulmonary embolism in the differential diagnosis, ordered appropriate diagnostic tests—such as a d-dimer or CT scan—to evaluate for clots, ensured Mr. Wirth was properly evaluated by a physician, and admitted him. MultiCare's staff did none of these things.

5.38    By failing to appropriately evaluate, diagnose, and treat Mr. Wirth, including by failing even to consider pulmonary embolism, failing to order basic tests, and discharging an unstable patient who should have been admitted, MultiCare and its providers breached the applicable standards of care.

5.39    Their breaches were a direct and proximate cause of Mr. Wirth's injuries and death. Had MultiCare followed the standard of care, MultiCare would have identified or strongly suspected pulmonary embolism, initiated anticoagulation or other appropriate treatment, and monitored him in the hospital. Instead, he was returned to a jail unprepared to manage his condition, where he deteriorated and died.

5.40    As a result of this medical negligence, Mr. Wirth suffered unnecessary pain and suffering, loss of chance of survival, and death, and his Estate and statutory beneficiaries have suffered economic and non-economic damages. Plaintiffs seek compensatory damages in an amount to be proven at trial, including damages

Connelly Law Offices
321 West Eighth Avenue
Spokane, Washington 99204
253.593.5100

1    recoverable under Washington's wrongful-death and survival statutes, and any further

2    relief the Court deems just and proper.

3    **F.     Sixth Cause of Action: Corporate Negligence (Against MultiCare)**

4    5.41    Based on the facts alleged above, Plaintiffs reallege and incorporate all

5    prior allegations as though fully set forth here and allege corporate negligence against

6    Defendant MultiCare Deaconess Hospital under Washington law.

7    5.42    As a hospital, MultiCare owed Mr. Wirth a direct and non-delegable duty

8    to use reasonable care in adopting and enforcing policies and procedures, in staffing and

9    supervising its medical personnel, and in ensuring that patients receive safe and

10    appropriate care. This includes a duty to design and implement systems that ensure

11    critically ill patients presenting with high-risk cardiopulmonary symptoms are

12    appropriately evaluated, monitored, and treated, regardless of incarceration or

13    perceived substance use.

14    5.43    MultiCare breached that duty by maintaining and enforcing policies and

15    practices that caused patients like Mr. Wirth—incarcerated, uninsured, or perceived as

16    "addicts"—to be screened primarily for "jail clearance" rather than for underlying

17    medical emergencies, and by discharging medically unstable patients back to jail rather

18    than admitting them for observation and treatment. Defendant MultiCare customarily

19    performs d-dimer tests and CT scans and admits similarly situated non-incarcerated

20    patients presenting with comparable symptoms.

21    5.44    These institutional failures were not isolated errors; they reflect a

22    systemic approach in which a detainee's role in the criminal process and perceived

23    addiction status overshadow clinical indicators of serious disease. In Mr. Wirth's case,

24

Complaint                         – 29 –                  Connelly Law Offices
                                                          321 West Eighth Avenue
                                                          Spokane, Washington 99204
                                                          253.593.5100

1   those corporate policies and omissions directly influenced how he was triaged, which

2   tests were ordered, whether he saw a doctor, and whether he was discharged.

3       5.45   MultiCare's corporate negligence was a direct and proximate cause of Mr.

4   Wirth's injuries and death. Because MultiCare failed to create or enforce adequate

5   policies and supervision, Mr. Wirth received an incomplete workup, was never seen by

6   a physician, and was discharged while still in an emergency medical condition, leading

7   to his deterioration and death in jail.

8       5.46   As a result, Mr. Wirth and his beneficiaries suffered the harms described

9   above. Plaintiffs seek compensatory damages against MultiCare in an amount to be

10  proven at trial, and such other relief as the Court deems just and proper.

### G.     Seventh Cause of Action: Negligence and Medical Negligence (Against Spokane County, NaphCare, Farmer, and Sprecher)

11

12      5.47   Based on the facts alleged above, Defendants Spokane County, NaphCare,

13  Farmer and Sprecher acted negligently and caused damages to Mr. Wirth and KW.

14      5.48   Spokane County owed Mr. Wirth a duty to exercise reasonable care to

15  protect him from foreseeable harm while in custody, including a duty to provide access

16  to timely and appropriate medical care and to implement reasonable monitoring and

17  response systems on 2-West. NaphCare and its medical staff, as health-care providers

18  under RCW 7.70, owed Mr. Wirth a duty to exercise that degree of skill, care, and

19  learning reasonably expected of similarly situated providers in Washington. Defendants

20  Farmer and Sprecher owed Mr. Wirth a duty to use reasonable care in conducting their

21  duties, including monitoring 2-West and responding to inmates in medical duress.

22      5.49   Defendants Spokane County and NaphCare breached these duties in

23  numerous ways, including: failing to act upon Mr. Wirth's persistently elevated heart

24

rate over the day following his return from MultiCare; failing to follow discharge instructions directing contact with cardiac services at Pulse Heart Institute; failing to have him evaluated by a physician or transferred back to the hospital despite clear signs that he remained medically unstable; delegating medical watch responsibilities to untrained guards on 2-West; failing to ensure that guards conducting medical checks confirmed signs of life; allowing the emergency duress button in Mr. Wirth's cell to be muted so that it produced no audible alarm; and tolerating or encouraging a culture in which deputies performed cursory rounds, watched entertainment on their phones during shifts, and disregarded detainees' cries for help.

5.50    Defendants Farmer and Sprecher breached their duties by failing to properly monitor inmates in obvious medical need, including Mr. Wirth, by failing to respond to cries for help, by failing to properly watch the medical alerts, by employing a muted medical alarm, and by watching television as Mr. Wirth slowly died.

5.51    These acts and omissions fell below the standard of ordinary care and, for NaphCare's medical personnel, below the professional standard of care.

5.52    As a direct and proximate result of these breaches, Mr. Wirth's pulmonary emboli remained undiagnosed and untreated; his collapse, convulsions, and cries for help were ignored; emergency response was delayed; and he ultimately suffered cardiopulmonary arrest and death. He also endured prolonged conscious pain and suffering, fear, and humiliation while lying unattended on the floor, while his cell alarm was muted, and while guards failed to check whether he was even alive.

5.53    Plaintiffs seek compensatory damages against Spokane County, NaphCare, Farmer and Sprecher in an amount to be proven at trial, including damages

Connelly Law Offices
321 West Eighth Avenue
Spokane, Washington 99204
253.593.5100

1    for Mr. Wirth's pre-death pain and suffering, his wrongful death, and the losses

2    sustained by his statutory beneficiaries.

3    ### H.    Eighth Cause of Action: Washington Negligent Supervision (Against Spokane County and NaphCare)

4    5.54    Based on the facts above, Defendants Spokane County and NaphCare

5    violated their duty to supervise their employees.

6    5.55    Defendants Spokane County and NaphCare each owed Mr. Wirth a duty

7    to exercise reasonable care in supervising their employees responsible for jail medical

8    care and inmate monitoring, including deputies assigned to 2-West and NaphCare

9    medical staff. That duty included ensuring that employees performed meaningful

10    medical checks, responded promptly to medical emergencies, and complied with

11    constitutional and professional standards of care.

12    5.56    Spokane County breached this duty by failing to supervise and correct

13    deputies who routinely performed cursory "for show" rounds; by allowing a culture in

14    which officers watched television on their phones rather than monitoring medically

15    fragile detainees; by tolerating muted or ineffective medical alarms; and by failing to

16    discipline or retrain staff after repeated inmate deaths, judicial findings of evidence

17    destruction, and explicit warnings about inadequate cell checks and failure to confirm

18    signs of life. NaphCare breached its duty of supervision by failing to ensure that its

19    medical staff followed up on abnormal vital signs, adhered to discharge instructions,

20    escalated care for deteriorating patients on 2-West, and intervened when guards

21    substituted for medical professionals in monitoring high-risk detainees.

22    5.57    These supervisory failures were a substantial factor in allowing line-level

23    employees to ignore Mr. Wirth's worsening condition, to treat medical watch as a

24

Complaint                                – 32 –                        <span>Connelly Law Offices</span>
                                                                       321 West Eighth Avenue
                                                                       Spokane, Washington 99204
                                                                       253.593.5100

paperwork formality rather than a serious responsibility, and to disregard his collapse, convulsions, and cries for help.

5.58    As a direct and proximate result of negligent supervision by Spokane County and NaphCare, Mr. Wirth suffered the injuries and death described above, and his Estate and beneficiaries have sustained damages. Plaintiffs seek compensatory damages in an amount to be proven at trial and any other relief the Court deems just and proper.

**I.     Ninth Cause of Action: Wrongful Death and Survival (Against All Defendants)**

5.59    Based on the facts above, Plaintiffs reallege and incorporate all prior allegations as though fully set forth here and bring wrongful-death and survival claims under RCW 4.20.010, 4.20.020, 4.20.046, and 4.20.060 against all Defendants whose acts and omissions contributed to Mr. Wirth's injuries and death.

5.60    At all relevant times, each defendant owed Mr. Wirth duties under federal and state law, including the constitutional duties described in the § 1983 causes of action and the statutory and common-law duties described in the state-law negligence and medical-negligence claims. Each defendant breached those duties in one or more ways set forth above. Had Mr. Wirth survived, he would have had valid claims for constitutional violations, medical negligence, negligence, and related torts against Defendants.

5.61    As a direct and proximate result of Defendants' wrongful acts and omissions, Mr. Wirth suffered conscious pain and suffering, fear, and loss of life. His Estate therefore has survival claims for his personal injuries, including pre-death pain and suffering, under RCW 4.20.046 and 4.20.060. Additionally, because Defendants'

Complaint                           – 33 –                  CONNELLY LAW OFFICES
                                                            321 West Eighth Avenue
                                                            Spokane, Washington 99204
                                                            253.593.5100

conduct caused Mr. Wirth's death, his statutory beneficiaries, including his minor child KW, have wrongful-death claims under RCW 4.20.010 and 4.20.020 for loss of love, affection, care, companionship, guidance, and support, as well as for economic losses resulting from his death.

5.62    Plaintiffs seek all damages recoverable under Washington's wrongful-death and survival statutes, including Mr. Wirth's pre-death non-economic damages, funeral and burial expenses, loss of earnings and earning capacity, and the beneficiaries' economic and non-economic losses, in amounts to be proven at trial.

## VI.  JURY DEMAND

6.1    Plaintiffs respectfully request a jury trial on all claims.

## VII.  RELIEF REQUESTED

Plaintiffs respectfully request the following relief: (1) an award of compensatory damages (both economic and noneconomic) in amounts to be proven at trial; (2) punitive damages pursuant to 42 U.S.C. § 1983 as outlined above; (3) attorneys' fees under 42 U.S.C. § 1988 as outlined above; and (4) such other relief as the Court deems appropriate.

CONNELLY LAW OFFICES
321 West Eighth Avenue
Spokane, Washington 99204
253.593.5100

Dated: December 1, 2025

Connelly Law Offices
Attorneys for Plaintiffs

s/Colin G. Prince
Colin G. Prince, WSBA No. 43166
2301 North 30th Street
Tacoma, Washington 98403
253.593.5100

John B. McEntire, IV, WSBA No. 39469
The Glover Mansion
321 W. 8th Street
Spokane, Washington 99204
253.593.5100